UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
RONALD HERNANDEZ HUNTER,

|  |  |
|---|---|
| Plaintiff, | 20 Civ. _____ |
| -against- | **COMPLAINT**<br>**JURY DEMANDED** |
| BOY SCOUTS OF AMERICA; GREATER NEW YORK<br>COUNCILS, BOY SCOUTS OF AMERICA; and<br>BROOKLYN COUNCIL, BOY SCOUTS OF<br>AMERICA, | |
| Defendants. | |

--------------------------------------------------------------------x

Plaintiff Ronald Hernandez Hunter, by and through his attorneys, Emery Celli

Brinckerhoff & Abady LLP, for his Complaint alleges as follows:

## INTRODUCTION

1.      The motto of Boy Scouts of America is "Prepared.  For Life."

2.      Tragically, for decades, the organization itself was woefully unprepared:
unprepared to confront and address rampant sexual abuse of scouts by the adult volunteers who
were supposed to teach, supervise, and care for them.

3.      The Boy Scouts have known for a century that sexual predators seek out
leadership roles in scouting and use their positions of trust to gain access to young boys who they
can readily abuse.

4.      Despite this knowledge, the Boy Scouts utterly failed to take even minimal steps
to address the issue, such as conducting background investigations of would-be troop leaders or
restricting adult volunteers' unsupervised access to boys on overnight trips.

5.      The predictable and preventable result of this complete abdication of responsibility has been the horrific sexual abuse of thousands of Boy Scouts.

6.      Plaintiff is one of those scouts.

7.      Plaintiff was sexually abused for years—and ultimately trafficked into coerced sex work—by the Assistant Scoutmaster of his Brooklyn Boy Scout troop in the 1970s.  The Assistant Scoutmaster was widely suspected of being a sexual predator, but no one did anything to keep Plaintiff safe from him.

8.      Today, Plaintiff's abuser is serving a life sentence in prison for serial child molestation.

9.      Now it is time for the Boy Scouts—the organization that stood by and did nothing while Plaintiff and thousands of other boys had their innocence stolen—to be held accountable.

**THE PARTIES**

10.     Plaintiff Ronald Hernandez Hunter ("Plaintiff") is a natural person and a citizen of the State of Florida.  From approximately 1973 to 1976, Plaintiff was a member of Boy Scout Troop 351 in Brooklyn, New York, an authorized and recognized program of Defendants.

11.     Defendant Boy Scouts of America ("BSA") is a Congressionally-chartered corporation authorized to do business in New York, with its principal place of business in Irving, Texas.  BSA is one of the largest scouting organizations in the United States of America and one of the largest youth organizations nationwide.  BSA operates by chartering local organizations to implement its scouting programs.  These local organizations are supported by local councils, which BSA authorizes and directs to carry out scouting programs.  At all relevant times, BSA possessed the ultimate authority to permit or prohibit anyone from serving as a leader or

volunteer of any Boy Scout troop, and to control the staffing, training, and oversight of such troops and local organizations.

12.     Defendant Greater New York Councils, Boy Scouts of America ("GNYC") is a domestic not-for-profit corporation organized under the laws of the State of New York, with its principal place of business in New York, New York.  GNYC is a local council of BSA that serves the New York City area by operating scouting programs for City youth.  Assets owned and controlled by GNYC include several scouting camps, among them Alpine Scout Camp in New Jersey and Ten Mile River Scout Camp in upstate New York.

13.     Defendant Brooklyn Council, Boy Scouts of America ("BC") is a domestic not-for-profit corporation organized under the laws of the State of New York, with its principal place of business in Brooklyn, New York.  BC is authorized to operate scouting programs in Brooklyn on behalf of BSA and GNYC.

14.     Upon information and belief, BSA, GNYC, and BC were, at all relevant times, jointly and collectively responsible for choosing, retaining, and supervising leaders and volunteers of Boy Scout troops in Brooklyn, including Troop 351.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the action is between citizens of different States and the amount in controversy exceeds $75,000.

16.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within the Eastern District of New York.

17.     This action is timely pursuant to the New York Child Victims Act, N.Y. CPLR §

214-g, because the action alleges intentional and/or negligent acts or omissions and claims injury

suffered as a result of conduct which would constitute a sexual offense under Article 130 of the

New York Penal Law, and Plaintiff was less than eighteen years old when such conduct was

committed against him.

**JURY DEMAND**

18.     Plaintiff demands trial by jury in this action.

**FACTUAL ALLEGATIONS**

I.     **The Boy Scouts Knowingly Harbored Child Molesters as Volunteers and
Actively Refused to Take Steps to Address Known Risks to Scouts' Safety**

19.     For approximately a century, BSA has known that adult volunteers and members

routinely abuse their roles in scouting to identify vulnerable children, groom them for sexual

abuse, and carry out that abuse.

20.      In 1935, BSA's chief executive, Dr. James West, acknowledged to the New York

Times that adult men "seek to enter Scouting" and "undertake to deal with sex matters and

become morbid on the subject and sometimes give way to temptation and develop practices

which make them degenerates."

21.     West acknowledged that BSA maintained files relating to men whom it had

deemed unfit to serve as volunteers, and estimated that about 1,000 of these files related to

pedophiles.

22.     BSA has referred to these files as "perversion files."  It has maintained such files

in some form since at least the 1920s, and continues to maintain them to this day.

23.     Upon information and belief, at no time during or prior to Plaintiff's participation

in the Boy Scouts did BSA undertake any systematic analysis of these files in order to determine

how so many pedophiles were able to infiltrate scouting and abuse their positions to prey on children sexually, or to design policies and practices to prevent abuse similar to that documented in the files from occurring in the future.

24.     Instead, upon information and belief, BSA for many years regularly destroyed such files as a matter of policy.

25.     BSA has also vehemently resisted any public disclosure of these files throughout its decades-long history of maintaining them.  In refusing to publicly disclose the files (or any information about them, including even how many predators or instances of sexual abuse were identified within them), BSA has actively deprived scouts, prospective scouts, and their families of information they could use to protect themselves against the dangers of sexual abuse by scout leaders and volunteers.

26.      Instead, BSA concealed the epidemic of child sexual abuse roiling within the organization and actively portrayed scouting to the public as a safe activity for children.

27.     For example, the edition of the *Boy Scout Handbook* in use between 1965 and 1972 referred to the Scoutmaster as "a wonderful man" and "the friend to whom you can always turn for advice."

28.     The edition of the *Boy Scout Handbook* in use between 1972 and 1978 stated that "your Scoutmaster" is "a great guy" who "gives hours of his time to you and the troop" because "he knows Scouting is important" and because "he is interested in boys."  This edition further stated: "Your Scoutmaster is interested in and wants to know about you.  Only then can he help you to have fun in Scouting."  It also directed scouts to "be loyal and obey" adult leaders, admire them, "stick by" them, meet privately with them, "prove" themselves to them, and "look up to" them.

29.     The 1972-1978 Handbook, which was in effect while Plaintiff was a Boy Scout, also told scouts that their Scoutmaster "wants to know you better," and for that reason would have a "personal growth agreement conference" where "you and your Scoutmaster will sit down for a talk." Scouts were encouraged to "[t]ell him about yourself" and to discuss "the things you like to do" and "what things you like to do." The stated purpose of these one-on-one meetings was to "help build a relationship between the man and the boy."

30.     At the time Defendants made these representations, they knew all too well that not all Scoutmasters were "wonderful men" or "great guys" whose selfless devotion to the spiritual betterment of young people rendered them worthy of scouts' trust and admiration. And they knew that encouraging scouts to spend time alone with adult volunteers and disclose personal information would make it easier for sexual predators to groom and abuse young victims like Plaintiff.

31.     In 1972, while Plaintiff was a Boy Scout, BSA adopted a policy concerning adult leaders deemed unfit for scouting. A memo concerning the policy, written by a BSA executive who oversaw the "perversion files," directed BSA leaders to keep the existence of the problem secret "because of misunderstandings which could develop if it were widely distributed."

32.     Part of the policy BSA adopted in 1972 included a form letter to be sent to leaders who were removed because of sexual abuse allegations. The letter stated, in part: "We are making no accusations and will not release this information to anyone, so our action in no way will affect your standing in the community."

33.     In 2012, the Los Angeles Times reviewed approximately 1,600 BSA "perversion files" from the period 1970 to 1991. The review found that BSA frequently allowed volunteers and employees suspected of sexually abusing children to resign voluntarily, citing false and

pretextual reasons.  In approximately 80% of cases where BSA learned of abuse allegations that had not already been reported to law enforcement, the review found no record that BSA reported the allegations when it learned of them.

34.     Although volunteers identified in the "perversion files" were supposedly banned from future roles in scouting, the ban was not diligently enforced, and men who had been removed due to allegations of child sexual abuse often returned to scouting and perpetrated additional abuse.

35.     It is unknown how many sexual abusers were identified in the "perversion files," but previous litigation revealed that from 1965 to 1985—which includes the period when Plaintiff was involved in scouting—BSA opened at least 1,247 such files.

36.     Thus, during the time when Plaintiff was a Boy Scout, BSA was, on average, receiving a reported allegation of sexual abuse of scouts by adult volunteers *more than once a week*.

37.      At least 10 men were added to the "perversion files" due to child sexual abuse allegations involving Boy Scout troops *in Brooklyn alone* before and during Plaintiff's time in Troop 351.

38.     The Boy Scouts opened at least 28 "perversion files" involving sexual abuse of scouts in New York City in just the ten years before Plaintiff joined.

39.     The Manhattan Council opened at least six "perversion files" in 1964 alone.  In a letter transmitting one report of alleged sexual abuse to BSA's National Council in December of that year, the Manhattan Borough Scout Executive wrote: "It seems as though this is going to be a banner year for us."

40.     Defendants were well aware of, and indifferent to, the known substantial risk that scouts like Plaintiff would be sexually abused by adult scout leaders.

41.     For example, in 1964, the Scoutmaster of a Boy Scout troop in Brooklyn was reported to have sexually molested boys during several Boy Scouts-sponsored overnight camping trips.  The molestation occurred at night, while the Scoutmaster was sleeping in tents with the boys.

42.     After Defendant BC investigated and substantiated the allegations, the Scoutmaster was asked to resign, and Defendants added the Scoutmaster to the "perversion files."  Upon information and belief, Defendants took no further actions and did not report the sexual abuse to law enforcement.

43.     In 1975, the same man sought to become chairman of a different Boy Scout troop. A BSA official wrote in a letter that, "[s]ince so much time has elapsed, we will approve his registration as Chairman of Pack 2381 and place him on two years probation."

44.     Upon information and belief, when Plaintiff joined the Boy Scouts, Defendants knew that adult leaders and volunteers had sexually abused numerous boys during officially sanctioned overnight camping trips, including at sites owned and operated by Defendants where Plaintiff was ultimately sexually abused, such as the Ten Mile River and Alpine camps.

45.     Despite this knowledge, Defendants failed to take any steps to protect boys participating in such trips, including Plaintiff, or to prevent such abuse from occurring in the future.

46.     Defendants failed to institute readily available policies and practices that would have prevented the foreseeable sexual abuse of Plaintiff and others, including:

a.   A prohibition on adult volunteers and leaders sharing sleeping accommodations alone with boys;

b.   A requirement of sufficient supervision of Scoutmasters and volunteers during overnight outings;

c.   A "two deep" rule requiring two adults to be present for all activities;

d.   A prohibition on one-on-one activities between adult volunteers and youths;

e.   Training for adult volunteers and staff, as well as scouts and their families, concerning how to report violations of safety policies;

f.   Training for adult volunteers and staff, as well as scouts and their families, concerning how to recognize common signs of sexual abuse or "grooming" of prospective abuse victims; and

g.   Standard protocols for investigating and appropriately managing allegations of sexual misconduct by adults in scouting.

47.   During the time of Plaintiff's participation in the Boy Scouts, Defendants, including BSA, actively monitored many aspects of the way their programs were implemented locally and at the troop level, such how particular merit badges should be awarded and how particular events and activities should be run.  Defendants, including BSA, also had the ability to require, and did require, various kinds of safety-related training and education concerning known hazards attendant to scouting (such as fire and knife safety).  Yet no such monitoring, control, training, or education was ever implemented with respect to addressing or preventing child sexual abuse in the Boy Scouts.

48.   BSA's corporate bylaws provide that "[n]o person shall be approved as a . . . leader unless, in the judgment of the [BSA], that person possesses and demonstrates the

moral, educational, and emotional qualities deemed necessary for leadership." Upon information and belief, a similar provision has appeared in the BSA's bylaws since the time of Plaintiff's participation in the Boy Scouts.

49.     Defendants failed for decades to require even minimal vetting of adult volunteers and scout leaders. Even as other national youth organizations began conducting criminal background checks of volunteers and staff, Defendants vehemently resisted imposing any such requirement.

50.      BSA did not require background investigations until 2008. As a result, BSA has allowed hundreds of men with arrests or convictions for child sexual abuse to become volunteer leaders with unfettered access to young boys.

51.     During the period of Plaintiff's participation in the Boy Scouts, Defendants never provided any warnings to Boy Scouts, prospective Boy Scouts, or their families that there was any risk of sexual abuse attendant to participating in their programs, or that such abuse had occurred frequently in the past.

**II.     Plaintiff's Involvement in Scouting Leads to Years of Unspeakable Sexual Abuse and Trauma**

52.     Plaintiff's difficult background and tumultuous childhood made him especially vulnerable—precisely the type of child Defendants should have been especially careful to protect. Instead, Defendants' indifference caused Plaintiff to fall into the hands of a serial child molester and suffer horrific abuse.

***Plaintiff's Troubled Early Childhood***

53.     Plaintiff was six years old when his father died in 1966.

54.     Less than a year later, in March 1967, Plaintiff's mother was psychiatrically hospitalized. Plaintiff was seven years old.

55.     Plaintiff was placed in foster care at the Angel Guardian Home in Brooklyn. After a brief placement with a foster family, he was transferred into the care of Abbott House, a foster care agency in Irvington, New York.

56.     Plaintiff remained in foster care with Abbott House until he was discharged in or about June 1972.

***Plaintiff Meets Assistant Scoutmaster Charlie Acevedo***

57.     Beginning around the spring of 1970, when Plaintiff was ten years old, Plaintiff would make regular visits from Abbott House to spend time with family in Brooklyn.  During these visits, Plaintiff stayed at a family apartment on Central Avenue in Bushwick, Brooklyn.

58.     In or around 1970, Plaintiff befriended a group of boys in the neighborhood, several of whom regularly played basketball at a local church.  The boys invited Plaintiff to play basketball with them, and he was introduced to their coach, Carlos "Charlie" Acevedo.  At the time, Charlie was in his 30s.

59.     Plaintiff soon learned that Charlie was also a local Boy Scout leader, volunteering as an Assistant Scoutmaster with Troop 351.

60.     Charlie learned that Plaintiff was in foster care and only visited Brooklyn on certain weekends and holidays.  He encouraged Plaintiff to become involved in scouting.

61.     In the ensuing months, Plaintiff got to know Charlie more.  He learned that Charlie had ingratiated himself to a number of parents of school-aged children in the neighborhood.

62.     As soon as Plaintiff turned eleven years old, Charlie asked Plaintiff to join the Boy Scouts.  Charlie told Plaintiff that he would need his mother's written permission to join.

63.     Charlie accompanied Plaintiff to his family's apartment, where he immediately began a charm offensive to win over Plaintiff's mother, complimenting her on her appearance, her home, and even her coffee-making skills.  Charlie reassured Plaintiff's mother that he was trustworthy, and she signed the Boy Scouts permission forms in 1972.

64.     When Plaintiff joined the Boy Scouts, Defendants required him to take the "Scout Oath," in which scouts pledge, among other things, to "obey the Scout Law."  The Scout Law is a set of principles that Scouts are required to follow, including obedience and loyalty to adult leaders.

65.     In connection with Plaintiff's participation in the Boy Scouts, Plaintiff and his mother received and absorbed Defendants' public-facing communications about the wholesome and safe nature of their programs and the trustworthiness of their adult volunteers, including without limitation the Boy Scouts Handbook and other books and written materials created and disseminated by Defendants.  Plaintiff joined the Boy Scouts and continued to participate as a result of receiving and absorbing these misleading and deceptive representations, ultimately leading to his sexual abuse at the hands of a Scout leader.

66.     Charlie continued to ingratiate himself with Plaintiff's family, including by paying for various recreation activities that the family could not afford (including the cost of Plaintiff's Boy Scout uniform).

67.     The imprimatur that his Boy Scouts leadership position afforded Charlie allowed him to win over Plaintiff's family and insinuate himself into Plaintiff's life.

68.     Charlie used his increasing involvement in the family's life to learn additional information about Plaintiff's family history, including that Plaintiff's mother suffered from a psychiatric disorder.

***Charlie, a Known Sexual Predator Who Defendants Provided with Access to Young Boys, Begins to Sexually Abuse Plaintiff***

69.     Unbeknownst to Plaintiff at the time, Charlie was widely regarded by people in the neighborhood as a sexual predator who spent inordinate time with school-age boys, ingratiated himself with their families, wormed his way into their lives, and sexually abused them.

70.     On one occasion, some older neighborhood boys warned Plaintiff's teenage brother that Charlie "did bad things with little boys."  Plaintiff and his mother, however, remained blissfully ignorant.

71.     Meanwhile, despite his notorious proclivities, Defendants allowed Charlie to continue volunteering with Troop 351.

72.     In or about the summer of 1972, when Plaintiff was 12 years old and had just returned from Abbott House to live permanently in Brooklyn, Plaintiff went on his first camping trip with Troop 351 to Alpine Scout Camp in New Jersey, which is owned and operated by Defendant GNYC.

73.     Charlie was one of the chaperones of the trip.  He selected Plaintiff to sleep in a tent with him, alone.

74.      Upon information and belief, Defendants had no policies or rules prohibiting adult volunteers from sharing sleeping accommodations with scouts, alone or otherwise, including during trips to camp sites Defendants owned and operated.

75.     That night, inside the tent, Charlie began wrestling with Plaintiff.  Charlie pinned Plaintiff to the ground and would not let him go.  Charlie then leaned over Plaintiff and pushed his erection against Plaintiff's thigh.  He grabbed Plaintiff's hand and commanded Plaintiff to "hold it."

76.     Charlie then commanded Plaintiff to put his hand inside Charlie's pants.  Plaintiff complied.

77.     Charlie rolled onto his side and pushed his underwear down, exposing himself to Plaintiff.

78.     Charlie commanded Plaintiff to masturbate him.  Plaintiff complied.

79.     Charlie then commanded Plaintiff to give him oral sex.  Plaintiff complied.

80.     After that camping trip, Charlie continued to sexually abuse Plaintiff.

81.     Charlie often brought Plaintiff to an apartment that belonged to Charlie's brother and sexually assaulted him there.

82.     Charlie repeatedly forced Plaintiff to perform oral sex on him, and attempted to anally penetrate Plaintiff on several occasions.

83.     This abuse occurred on an ongoing basis for years, beginning when Plaintiff was approximately 12 years old.

84.     Plaintiff felt unable to challenge or disobey Charlie because of his leadership position in the Boy Scouts and because of the Boy Scouts' emphasis on loyalty and obedience to adult leaders.

85.     During this period, Charlie repeatedly sexually abused Plaintiff during Boy Scouts-sanctioned activities and outings, including a cross-country road trip that Charlie chaperoned.

86.     Charlie sexually abused Plaintiff during approximately 15 or more different overnight Boy Scouts camping trips, including at scouting camps owned by Defendants, such as Ten Mile River and Alpine.  He was able to perpetrate this abuse unimpeded because Defendants

allowed volunteers like Charlie to be alone and unsupervised with young boys, including overnight in tents and lean-tos where they could not be observed.

87.     Plaintiff did not feel he could report the abuse to anyone.  Charlie often threatened that if Plaintiff told anyone, Charlie would expose Plaintiff as a pervert or tell child welfare authorities that Plaintiff's mother was not well enough to properly care for her children.  Plaintiff was terrified that he would once again be taken from his home and placed in foster care.

***Charlie Was Not the Only Child Molester in Troop 351; He Followed the Lead of the Troop's Scoutmaster, Gordon Bennett, Who Also Abused Boy Scouts***

88.     The head Scoutmaster of Troop 351, Gordon Bennett, was also a known sexual predator.

89.     In particular, it was widely known that Bennett "took care of" one particular boy who lived on Plaintiff's block who was also a member of Troop 351.  Bennett's sexual "relationship" with this boy was widely known, but Defendants allowed Bennett to continue leading Troop 351.

90.     Bennett's sexually inappropriate conduct was open and notorious.  For example, Bennett often stripped off his clothing during Boy Scouts baseball games and ran the bases nude.  Although Bennett did this publicly and repeatedly, Defendants allowed him to continue leading Troop 351.

91.     Defendants' open tolerance of Bennett's widely known conduct contributed to Plaintiff's belief that reporting Charlie's abuse would be futile.

92.     Charlie was well aware of Bennett's sexual abuse of a boy who was a member of Troop 351.

93.     Upon information and belief, Defendants' tolerance of Bennett's widely known sexual misconduct contributed to Charlie's sense of impunity and his belief that he had license to

continue abusing Plaintiff with no meaningful risk of being caught or stopped.  The unspoken

understanding between Charlie and Bennett allowed sexual abuse of scouts in the troop to

continue unabated.

***Charlie's Abuse Escalates and Continues for Years, Nearly Destroying Plaintiff's Life***

94.     As the sexual abuse continued, Charlie slowly but surely infiltrated all aspects of

Plaintiff's life.  He walked Plaintiff to school and to Communion classes, and even convinced

Plaintiff's mother to designate him as Plaintiff's Godfather.

95.     Eventually, Charlie secretly set up sleeping accommodations in a basement

storage unit in his brother's apartment building.  He frequently brought Plaintiff there to sleep.

Charlie often sexually abused Plaintiff in the storage unit, or snuck Plaintiff upstairs into his

brother's apartment for sexual encounters.

96.     The night before Plaintiff's Confirmation, Plaintiff confronted Charlie and told

him that it was against Church teachings for the two to be having sexual contact.  Charlie

initially agreed that the sexual abuse would cease, but ultimately raped Plaintiff that same night,

telling him it would be their "one last time together."

97.     Despite his promise, Charlie forced himself on Plaintiff just a few days later.

Plaintiff begged him to stop, and Charlie slapped him across the face, commanding Plaintiff,

"Don't tell me no!"

98.     Thereafter, Charlie continued to coerce Plaintiff into sexual encounters, often

using physical violence.

99.     As the abuse progressed, Charlie began forcing Plaintiff into sex work.

100.     Charlie trafficked Plaintiff to johns in Times Square over a period of years during Plaintiff's adolescence in the 1970s.  During this period, Plaintiff was molested and raped by hundreds of men.

101.     Charlie's sexual abuse and trafficking of Plaintiff continued until approximately 1976, when Plaintiff was sixteen years old.

102.     Throughout this time, Charlie continued to volunteer as an Assistant Scoutmaster for Defendants.  No one intervened to halt Charlie's abuse of Plaintiff, or to otherwise limit Charlie's access to young boys.

***Plaintiff Attains the Designation of Eagle Scout, While Charlie Attains the Designation of Dangerous Sexual Felony Offender***

103.     On January 19, 1976, at age 16, Plaintiff attained the rank of Eagle Scout, the highest achievement attainable in the BSA.

104.     After Plaintiff's time in the Boy Scouts ended, Charlie Acevedo moved to Florida.

105.     In 1981, Charlie was charged and convicted for coercing an 11-year-old boy into oral sex.

106.     In 1993, Charlie was indicted by a federal grand jury for possession of child pornography.  According to court filings, the indictment arose from an incident in which Charlie "had procured prostitution from a boy under 16 years of age."  He pled guilty and was sentenced to 51 months of imprisonment.

107.     In 2006, Charlie was charged with lewd and lascivious battery of a minor.  He was convicted in 2008 after a jury trial.

108.     Due to his multiple convictions for sexual offenses involving children, the Florida court declared Charlie a dangerous sexual felony offender.  That designation was upheld by the Florida Supreme Court in 2017.  *See Acevedo v. State*, 218 So.3d 878 (Fla. 2017).

109.    Acevedo is now serving a life sentence in prison in Florida.

***Plaintiff Suffered Unspeakably as a Result of Defendants' Negligence***

110.    Plaintiff was deeply scarred by years of sexual abuse he endured.

111.    Plaintiff attempted suicide multiple times as a result of the hopelessness and despair he felt due to being serially sexually abused.

112.    After his time in the Boy Scouts, Plaintiff became addicted to drugs.

113.    By 1984, Plaintiff was homeless.

114.    Plaintiff joined the United States Army in September 1984.  He served honorably until his retirement from the military in 2000.  He has painstakingly built a life for himself, doing his best to overcome the profound trauma that was inflicted on him in his youth.

115.    Nevertheless, Plaintiff has suffered for many years from depression and post-traumatic stress disorder as a result of the abuse he suffered.

116.    Even today, Plaintiff frequently experiences night terrors and awakens screaming as he relives his years of horrific childhood sexual abuse in his sleep.

117.    Plaintiff also suffered excruciating physical pain and suffering as a result of being forcibly penetrated during the rapes he endured.  He has required multiple medical procedures to address residual physical damage from the abuse.

118.    Plaintiff's adolescence was stolen from him because of Defendants' failure to protect him from horrific and sadistic abuse.  Nothing can undo or reverse the anguish he has suffered and continues to suffer to this day.

## FIRST CAUSE OF ACTION
### Negligence

119.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

120.    Defendants had a duty to take reasonable steps to protect Plaintiff from foreseeable harm during Plaintiff's time as a Boy Scout.

121.    Defendants had a duty to take reasonable steps to prevent Carlos Acevedo from taking advantage of his position as a volunteer to sexually abuse Plaintiff.

122.    Defendants exercised supervision, care, and custody over Plaintiff during his participation in the Boy Scouts, including without limitation during overnight outings at camp sites owned and operated by Defendants.

123.    Defendants breached the aforementioned duties by failing to exercise reasonable care to prevent the sexual abuse of Plaintiff from occurring.

124.    Defendants breached these duties by, *inter alia*, failing to conduct appropriate background investigations of adult volunteers and leaders; by failing to institute appropriate policies to prevent adult volunteers from sharing sleeping accommodations with young boys unsupervised and unaccompanied by anyone; by failing to require sufficient supervision and oversight of adult volunteers during overnight outings; by failing to implement a "two deep" rule requiring that two adults be present for all activities; by failing to prohibit one-on-one activities between adult volunteers and youths; by failing to train adult volunteers, staff, scouts, and family members about how to recognize and report violations of safety policies; by failing to train adult volunteers, staff, scouts, and family members about how to recognize common signs of sexual abuse or "grooming" of prospective abuse victims; by failing to implement standard protocols for investigating and appropriately managing allegations of sexual misconduct by adults in

scouting; by entrusting their premises and instrumentalities to persons they knew or should have known to be sexual predators, including Carlos Acevedo; and by hiring, retaining, and failing to supervise Acevedo and providing him with unfettered access to Plaintiff and other children.

125.    In breaching these duties, Defendants, through their acts and omissions, created and/or increased the risk that Plaintiff would be sexually abused.

126.    The sexual abuse Plaintiff suffered was a reasonably foreseeable result of Defendants' breach of their duties.

127.    As a direct and proximate cause Defendants' negligence, Plaintiff suffered the damages hereinbefore alleged.

**SECOND CAUSE OF ACTION**
**New York General Business Law § 349**

128.    Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

129.    Defendants made misrepresentations and deceptive omissions by portraying scouting as a safe and wholesome activity for children, telling scouts and their families that Scoutmasters and adult volunteers were trustworthy and caring leaders who had scouts' best interests at heart, and by failing to warn scouts and their families about the known risks of sexual abuse in scouting and the fact that numerous scouts had been sexually abused by adult volunteers as a result of their participation in the Boy Scouts.

130.    These misrepresentations and omissions were likely to mislead a reasonable consumer and did in fact mislead Plaintiff and his family.

131.    As a direct and proximate cause of Defendants' deceptive practices, Plaintiff suffered the damages hereinbefore alleged.

## APPORTIONMENT ALLEGATIONS

132.  At all times relevant hereto, Defendants acted with reckless disregard for the safety of others.

133.  At all times relevant hereto, Defendants acted knowingly to cause the acts or failures upon which liability is based.

134.  By reason of the foregoing, Defendants are precluded from limiting their liability through the apportionment of liability to any joint tortfeasor.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.  Compensatory damages in an amount to be determined;

2.  Punitive damages in an amount to be determined;

3.  Treble damages pursuant to New York General Business Law § 349(h);

4.  An order awarding Plaintiff reasonable attorneys' fees, together with costs and disbursements, pursuant to New York General Business Law § 349(h) and the inherent powers of this Court; and

5.  Such other further relief as the Court may deem just and proper.

Dated: January 19, 2020

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:_____/s/_____
        Debra L. Greenberger
        David A. Lebowitz
600 Fifth Avenue, 10th Floor
New York, New York 10020
 (212) 763-5000

*Attorneys for Plaintiff*